UNITED STATES DISTRICT COURT
MISSOULA DIVISION, DISTRICT OF MONTANA

IN THE MATTER OF THE
SEARCH OF:

Cellular Telephone assigned call
number (406) 309-4884.

MJ-23- 20 -M-KLD

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

I, Samantha Kilbride, being first duly sworn, depose and say that the following is true and correct to the best of my knowledge and belief:

a. That in or about January 30, 2023, and February 10, 2023, in Flathead County, in the State and District of Montana, the defendant, KEVIN PATRICK SMITH, knowingly threatened to assault a Member of Congress, in violation of 18 U.S.C. § 115(a)(1)(B), with the intent to impede, intimidate, and interfere with the official duties while engaged in the performance of official duties, and with intent to retaliate against such official on account of the performance of official duties.

## INTRODUCTION AND AGENT BACKGROUND

1. I am a duly sworn Special Agent for the United States Capitol Police and have been so employed since March 2020. Previously, I worked as a uniformed law enforcement officer for the United States Capitol Police for approximately four years. I have a Bachelor of Arts degree and a Master's of Science in Psychology. I have received approximately 26

weeks of uniformed law enforcement training and approximately 16 weeks of advanced criminal investigations training on the federal level. I have conducted numerous investigations involving violations of U.S. code, with the majority of my experience stemming from investigations involving threats to Members of Congress.

2. This affidavit is based upon my personal participation in the investigation described below, my training and experience, my review of records, information received from interviews, and information obtained from other law enforcement officers and investigators. Because this Affidavit is for the limited purpose of establishing probable cause to support the search of Kevin Patrick SMITH's cellular telephone, it contains only a summary of the relevant facts. I have not included each and every fact known to me concerning this investigation.

## PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of an application for a search warrant for the content associated and housed within a certain wireless telephone, (the "Subject Phone"). The information to be searched is described in the following paragraphs and in Attachment A.

4. There is probable cause to believe that the Subject Phone, as described in Attachment A, contains the fruits, instrumentalities, and/or evidence of

the transmission with the threat to injure, in violation of 18 U.S.C. § 115(a)(1)(B), (the "Target Offense"), as described in Attachment B. Consequently, there is probable cause to search the Subject Phone for evidence pertaining to the Target Offense. Forensic analysis of the data stored on this device and the data associated with the Subject Phone will assist in developing the federal investigation.

5. This affiant writes this affidavit in support of another search warrant to clarify the scope of this investigation. The search warrant previously approved by this Court was for any and all electronics recovered from SMITH's residence. The Subject Phone was recovered off the person of SMITH during an authorized search-incident-to-arrest after he was taken into custody while on the curtilage of the residence. Out of an abundance of caution, this affiant seeks approval of forensic analysis to be conducted on the Subject Phone given that it was not recovered inside the residence.

6. As set forth in greater detail below, on January 30, 2023, and February 10, 2023, SMITH called Senator Jon Tester's Kalispell District Office and left threatening voice messages while using the device associated with phone number 406-309-4884. In particular, the cell tower data, call records, Global Positioning Device ("GPS") data, phone-call-routing

information, downloaded media, cached information, photographs, applications, documents, notes, and network routing information, requested in Attachment B, will assist in the evaluation of evidence of in this investigation.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

*Forensic Analysis*

8. Based on your affiant's knowledge, training, and experience, they know that electronic devices, such as the Subject Phone, can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the devices. This information can sometimes be recovered with forensics tools.

9. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the electronic devices were used, the purpose of their use, who used them,

and when. There is probable cause to believe that this forensic electronic evidence might be on any electronic devices seized because: Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

10. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

11. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information

necessary to understand other evidence also falls within the scope of the warrant.

12. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

13. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of the Subject Phone. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

14. *Manner of execution.* The forensic examination of the Subject Phone will not take place on premises. Therefore, this affiant submits there's reasonable cause for the court to authorize forensic examination of the Subject Phone any time, day or night.

15. Additional definitions listed below apply to Attachment B.

    a. "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions,

and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." Computer includes cellular and/or smart telephones.

b. "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, flash memory cards, thumb drives and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

c. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

d. "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

e. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f. The terms "records," "documents," and "materials," used herein include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to writings, drawings, and paintings), photographic form (including, but not limited to

microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, and photocopies), mechanical form (including, but not limited to, phonograph records, printing, and typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as digital cameras, floppy diskettes, hard disks, CD-ROMs and digital video disks (DVDs), Personal Digital Assistants (PDAs), Multimedia Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, laptop computers or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device.

## **PROBABLE CAUSE**

16. Since assigned this case on January 30, 2023, I have received information that Kevin Patrick SMITH, contacted Senator Jon Tester's district office in Kalispell, MT, and left several voicemails containing threats against Senator Jon Tester, with the intent to influence, impede, or retaliate against him.

17. On January 30, 2023, the State Director of Senator Jon Tester's office reported six concerning voicemails left by the phone number 406-309-4884. They reported the unknown individual has called their office

dozens of times since the end of 2022, but the caller has never left their name or information. In one of the reported voicemails, the caller stated the following threats over voicemail: "Hey, Little John, and its time here your decrepit want to be pedophile loving FBI to come to my door so I want you to understand something. I want you to understand something very, very clearly. It's 100% Clear. There is nothing I want more than to have you stand toe to toe with me. You stand toe to toe with me. I rip your head off. You die. You stand in a situation where it is physical between you and me. And you die. I want you to understand that right now. There is no, you can send your fucking decrepit FBI. I don't care. You try your little games. You're a little bullshit. But if you stand in front of me, and you push, you die. I win every time. You don't have a chance. You suck. You suck dick. You're a pedophile. You support a pedophile, and I will not hold back. I will never stop. You suck ass. And I would love to destroy you and rip your fucking head from your shoulder. That is no trouble. Call that a threat. Then the FBI. Send your little decrepit pieces of shit my way."

18. On the same date, a second voicemail from the same phone number, 406-309-4884, stated the following threats over voicemail: "The only way you win is to stand toe to toe. Stand right in front of me. I'm sure

that toe to toe is a hard thing for you to understand. If you can't figure that one out. Stand in front of me. And you and I have it out. You do what you're gonna do. Please don't do anything physical. Because I'll kill you. I'll rip your fucking head off. I will destroy you."

19. On the same date, a third voicemail from the same phone number, 406-309-4884, stated the following threats over voicemail: "Little John, Little decrepit piece of shit John, little crybaby, tyrannical piece of shit John, I need you to understand something. Everything. Everything depends on how you respond. If you are capable of having a conversation, then we can have a conversation. You're still gonna lose. All of your democratic ideals will still lose, and they'll still go off the side windows. But if you ever, ever attempt something physical, if you ever try, don't do it. I will rip your head off. I will kill you. There is no doubt about it. You are a piece of shit. If you cannot have a coherent conversation, then you don't get to live. If you have to resort to a physical confrontation, you lose. You will lose in an intellectual conversation. You will lose in every other aspect. But if you try something physical, I will destroy you."

20. On the same date, a fourth voicemail from the same phone number, 406-309-4884, stated the following threats over voicemail: "I want your dumbass to do something. Try it. See what happens. Let's see how this goes. I would love to see the outcome. The situation here is I would love to fucking kill you. I would love to see your FBI at my door. I would love to see something in the news."

21. On the same date, a fifth voicemail from the same phone number, 406-309-4884, stated the following threats over voicemail: "Little John. Little insignificant piece of shit John. I missed something. When I threatened you, I threatened you on purpose. But I missed something. You're not the only person that can start a physical altercation. Your degenerate piece of shit FBI or Secret Service. Whoever is hanging around you? They don't have a chance. If they threatened me while you are in my presence, you die. If they play their games while you are in my presence, you die. And you understand this. Your only way of not dying is to stand toe to toe and have a conversation like a real man. The rest of these fuckers I already know they are decrepit. They are criminal. They are lost. I have no interest in whether they live or not. I have no interest in whether I live or not. You stand toe to toe, real man."

22. On the same date, January 30, 2023, Jenna Blackford, employed as analyst for United States Capitol Police, was assigned to identify the subscriber using the phone number 406-309-4884. The caller was fully identified through open source and law enforcement databases as Kevin Patrick SMITH. SA Kilbride found the cell phone number returned to SMITH and is also associated with his business, Elemental Pools and Spas.

23. Due to the threatening nature of the statements, I, Special Agent Kilbride, contacted the Kalispell Police Department and made the department aware of the current threat investigation regarding an individual living in their jurisdiction. For the welfare and safety of the Senator and his staff members, additional directed patrols were requested to be in the area of the district office, 8 3rd St E, Kalispell, MT 59901. Additionally, Special Agent Kilbride contacted the Big Sandy Sheriff's Office, the jurisdiction the Senator lives in, and briefed them on the current investigation. Their department agreed to have additional patrols around the area of the Senator's home and provided their patrols with information of SMITH for awareness.

24. The staff members of the district office were updated with a summary of the investigation thus far and were provided a photo of Kevin SMITH

for their own safety and awareness. Due to their fear for their safety, the majority of the Kalispell district office has not wanted to work in their office out of concern SMITH will come to the office and harm them. Since the initial phone calls, the Senator and his staff members have considered new options for security for both his residence and for his office directly due to the threats made by SMITH.

25. On the same date the voicemails were reported, Special Agent Kilbride submitted an interview request for SMITH to be interviewed by the FBI. On February 1, 2023, Special Agent Jason Grende and Special Agent Jacob Furda attempted to locate and interview SMITH but were unable to contact him. Later on the same date, at approximately 3:50 p.m., Special Agent Trevor Hare (FBI), FBI Special Agent Jacob Furda (FBI), Task Force Officer Ryan Stoll (FBI), and Task Force Officer Jody McLeod (FBI) attempted to contact Kevin Patrick SMITH at his listed residence, 1015 5th Avenue East, Kalispell, Montana, 59901. The agents spoke with his spouse, Holly, until SMITH arrived. The agents identified themselves to SMITH and stated the purpose of the interview was about phone calls he made to Senator Tester's office. Smith replied, "I believe I've called him a few times, but I'm not sure when." Special Agent Hare asked if SMITH intended to scare Senator Tester when he called him or

if he desired for him to change his politics. SMITH replied he was unsure but wished Senator Tester would just do things right. Special Hare admonished him to stay away from threats of physical violence if he called a government official in the future. At this point, SMITH denied making any threats of physical violence. The phone number SMITH stated was a good number for him to be reached at appears to be one and the same as the phone number used to leave the threatening voice messages at Senator Tester's Kalispell district office.

26. After his contact with law enforcement, SMITH continued to call the Kalispell district office several times a day. On February 11, 2023, the Chief of Staff of Senator Tester's office forwarded several concerning voicemails SMITH left on or about the dates of February 10, 2023, and February 11, 2023.

27. In a voicemail received on or about February 10, 2023, SMITH stated the following on a recorded voicemail: "Don't pull the fucking trigger. I want you to understand. If I ever pull my trigger. I know what dies." In another voicemail received on the same date, he stated, "No one with any understanding of anything pulls the trigger. Unless they know what they're shooting at. I guaran-goddamn-tee you. My trigger doesn't get pulled until I know what I'm shooting at. And when I know what I'm

shooting at, and I've decided its dead, it gets pulled. And there's no if ands or buts about it. And there's no coming back from that." In another voicemail received on the same date, he stated, "Don't shoot shit unless you know what it is. I know who you are."

28. On February 13, 2023, SMITH continued to call the office and left several concerning voice messages. In one of the reported voicemails, he stated the following: "It is important that you understand that I won't live under your rule. You have no concept of decency, you're pedophiles and you're criminals. If it becomes time that I die, I'd take a significant number with me."

29. On February 22, 2023, U.S. Capitol Police and the Federal Bureau of Investigations executed an arrest warrant for SMITH outside of his home residence in his front driveway. During the arrest process, a cellphone was located in one of his pockets by the agent conducting his search-incident-to-arrest. The cellphone, a Nokia model TA-1333, was taken into evidence, and it is the Subject Phone.

30. On the same date, U.S. Capitol Police and the Federal Bureau of Investigations executed a search warrant of SMITH's home residence, 1015 5th Ave E, Kalispell, MT. During this search warrant, the following was taken into evidence: 10 long guns, 8 pistols, a self-made silence

suppression (silencer), a shotgun barrel that was located in a cardboard box with the handwritten word "Oswald" on the exterior of the box, approximately 1,000 rounds of ammunition of various calibers, and several electronic devices, such as laptop computers, tablets, cellphones, SanDisk cards, a DVR storage system, and an external hard drive.

31. On the same date, this affiant, Special Agent Samantha Kilbride, and her partner, Special Agent Vincent Veloz, conducted an interview with SMITH.

32. SMITH was advised of his Miranda Rights and he willingly spoke to both agents. During this interview, he verified his identity, his address, and his phone number. The agents played a few of the threatening voicemails SMITH left at the Kalispell District Office for Senator Jon Tester. He stated he felt he may have pushed it too far and he "should have stopped calling a long time ago." When questioned why he made the threats, he denied making the threats. SMITH, in his subjective opinion, felt his statements were not threatening. When asked if he had any plans to follow through on his threats, he said he did not plan to truly harm the Senator.

_____
Samantha Kilbride
Special Agent, USCP


Subscribed to and Sworn before me this 23 day of February 2023.

_____
Kathleen L. DeSoto
United States Magistrate Judge